No. 25-5004

—————————————————

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

—————————————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

and

OSAGE MINERALS COUNCIL,
*Intervenor Plaintiff-Appellee*,

v.

OSAGE WIND, et al.
*Defendants-Appellants.*

—————————————————

On Appeal from the United States District Court
for the Northern District of Oklahoma
No. 14-cv-00704 (Hon. Jennifer Choe-Groves)

—————————————————

**RESPONSE BRIEF FOR THE UNITED STATES**

—————————————————

ORAL ARGUMENT REQUESTED

—————————————————

CLINTON J. JOHNSON
*United States Attorney*
*Northern District of Oklahoma*

NOLAN M. FIELDS IV
*Assistant United States Attorney*
110 W 7th St, Ste 300
Tulsa, OK 74119
918.382.2700
Nolan.Fields@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF RELATED CASES ............................................................... viii

GLOSSARY ......................................................................................................... ix

INTRODUCTION ................................................................................................. 1

STATEMENT OF THE ISSUES ........................................................................... 2

STATEMENT OF THE CASE ............................................................................... 3

     A.     Background ............................................................................ 3

          1.     The Osage Mineral Estate ................................................ 3

          2.     The Osage Wind Project .................................................. 5

     B.     The litigation through this Court's 2017 Decision ............................... 7

     C.     Proceedings on remand from the 2017 Decision ................................. 9

          1.     The 2023 Decision ......................................................... 9

          2.     The 2024 Decision ....................................................... 11

SUMMARY OF ARGUMENT ............................................................................. 12

STANDARD OF REVIEW .................................................................................. 14

ARGUMENT ....................................................................................................... 15

I.     The district court properly found Enel liable for continuing trespass .......................................................................................................... 15

II.     The district court properly awarded damages for trespass against the OME for as long as the trespass continues .................................. 22

III.     The district court did not abuse its discretion in ordering injunctive relief as a remedy for Enel's continuing trespass .......................... 25

A.    Enel waived the right to challenge the scope of the injunction. ........................................................................... 26

B.    An injunction was warranted ............................................................ 30

　　1.    The Plaintiffs established harm from Enel's continuing trespass that cannot be prevented or remedied by money damages. ...................................................... 31

　　　　a.    Money damages are not an adequate remedy for Enel's refusal to apply for an Osage mining lease. ................................................... 34

　　　　b.    Enel's refusal to apply for a mining lease interferes with Osage tribal sovereignty. ........................ 37

　　　　c.    Enel requires a mining lease for its continued exploitation of the Osage minerals. ........................................................... 43

　　2.    The balance of harms weighs in favor of the permanent injunction ejecting the wind farm. .......................... 44

　　3.    The permanent injunction will not adversely affect the public interest. ................................................... 46

IV.    The district court properly awarded the Plaintiffs attorneys' fees and costs. ......................................................................... 48

CONCLUSION ................................................................................... 54

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531 (1987) ........46

*Cornelius v. Moody Bible Inst. of Chicago*,
18 P.3d 1081 (Okla. Civ. App. 2000) .................................................54

*Crandall v. City & Cnty. Of Denver*, 594 F.3d 1231 (10th Cir. 2010) ..................15

*Davilla v. Enable Midstream Partners, L.P.*,
913 F.3d 959 (10th Cir. 2019) ................................................ 16, 21, 26, 30-31

*Fairlawn Cemetery Ass'n. First Presbyterian Church, U.S.A. of Okla.*,
496 P.2d 1185 (Okla. 1972)................................................................16

*First Pennsylvania Bank, N.A. v. E. Airlines, Inc.*,
731 F.2d 1113 (3d Cir. 1984) ...........................................................45

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) .....................................47

*Fletcher v. United States*, 153 F. Supp. 3d 1354 (N.D. Okla. 2015)................. 38-39

*Fletcher v. United States*, 854 F.3d 1201 (10th Cir. 2017) ...................................54

*Fletcher v. United States*, CFC No. 1:19-cv-01246 (filed Dec. 20, 2019)..............40

*Gale v. City & Cnty. of Denver*, 962 F.3d 1189 (10th Cir. 2020) ..........................30

*Garza v. Davis*, 596 F.3d 1198 (10th Cir. 2010) .............................................. 28-29

*Imperial Granite Co. v. Pala Band of Mission Indians*,
940 F.2d 1269 (9th Cir. 1991) ...........................................................42

*Kimzey v. Flamingo Seismic Solutions, Inc.*,
696 F.3d 1045 (10th Cir. 2012) .................................................. 52-53

*Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014) .............................................30

*Lewis v. Steward*, 230 P.2d 455 (Okla. 1951)..................................................... 20-21

*Marino v. Otis Eng'g Corp.*, 839 F.2d 1404 (10th Cir. 1988) ................................52

*Marsh v. Brooks*, 49 U.S. 223 (1850) ............................................................... 42-43

*Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982) .......................................41

*Millsap v. Andrus*, 717 F.2d 1326 (10th Cir. 1983) ..........................................19, 38

*Nat'l Livestock Credit Corp. v. Schultz*, 653 P.2d 1243 (Okla. Ct. App. 1982) .....53

*Oneida Cnty. v. Oneida Indian Nation of New York State*, 470 U.S. 226 (1985) ...23

*Osage Nation v. Irby*, 597 F.3d 1117 (10th Cir. 2010) ............................... 38-39, 42

*Osage Tribe of Indians of Oklahoma v. United States*, 85 Fed. Cl. 162 (2008) .....40

*Parks v. Am. Warrior, Inc.,* 44 F.3d 889 (10th Cir. 1995) ................................ 51-52

*Platt v. Winnebago Indus., Inc.*, 960 F.3d 1264 (10th Cir. 2020) ..........................28

*Prairie Band of Potawatomi Indians v. Pierce*,
   253 F.3d 1234 (10th Cir. 2001) ..........................................................................47

*Ramos v. Banner Health*, 1 F.4th 769 (10th Cir. 2021) ................................... 14-15

*Rios v. Ziglar*, 398 F.3d 1201 (10th Cir. 2005) ....................................................29

*R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc.*,
   835 F.2d 1306 (10th Cir. 1987) .................................................................... 50-51

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) ..............................54

*Schrier v. Univ. of Colo.*, 427 F.3d 1253 (10th Cir. 2005) ....................................36

*Seneca-Cayuga Tribe of Okla. v. State of Okla. ex rel. Thompson*,
   874 F.2d 709 (10th Cir. 1989) ......................................................................44, 47

*Stites v. Duit Constr. Co.*, 992 P.2d 913 (Okla. Ct. App. 1999) ............................53

iv

*Sundance Energy Okla., LLC v. Dan D. Drilling Corp.*,
  836 F.3d 1271 (10th Cir. 2016) ................................................................... 53-54

*Supre v. Ricketts,* 792 F.2d 958 (10th Cir. 1986) ....................................................15

*Swinomish Indian Tribal Cmty. v. BNSF Railway Co.*,
  951 F.3d 1142 (9th Cir. 2020) ............................................................................43

*Tarrant Reg. Water District v. Herrmann*, 656 F.3d 1222 (10th Cir. 2011)...........14

*Tele-Communications, Inc. v. Commissioner of Internal Rev.*,
  104 F.3d 1229 (10th Cir. 1997) .................................................................... 29-30

*Tenn. Valley Auth. v. Jones,* 199 F. Supp. 3d 1198 (E.D. Tenn. 2016) .................45

*Turner Roofing & Sheet Metal, Inc. v. Stapleton*, 872 P.2d 926 (Okla. 1994) .......53

*United States v. Mazurie*, 419 U.S. 544 (1975) .......................................................38

*United States v. Osage Wind*, LLC,
  871 F.3d 1078 (10th Cir. 2017) ............................. 3-8, 17-19, 21-22, 32, 41-42

*United States. v. Pend Oreille Cnty. Pub. Util. Dist. No. 1*,
  28 F.3d 1544 (9th Cir. 1994) .............................................................................36

*United States v. Pend Oreille Cnty. Pub. Util. Dist. No. 1*,
  135 F.3d 602 (9th Cir. 1998) ........................................................................36, 43

*Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*,
  790 F.3d 1000 (10th Cir. 2015) .........................................................................37

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ...........................................47

*Weyerhauser Co. v. Brantley*, 510 F.3d 1256 (10th Cir. 2007) ........................48, 52

*Woods Petroleum v. Delhi Gas Pipeline Corp.*, 700 P.2d 1011 (Okla. 1984) ........53

*Wyandotte Nation v. Sebelius,* 443 F.3d 1247 (10th Cir. 2006)..............................37

## Statutes and Rules

Act of June 5, 1872, ch. 310, 17 Stat. 228 .................................................................3

Act of June 28, 1906 (1906 Act), ch. 3572, 34 Stat. 539 .....3-4, 9, 13, 21, 38-40, 42

    34 Stat. 540 ...........................................................................................................3

    34 Stat. 543 ......................................................................................................... 3-4

    34 Stat. 544 ................................................................................................4, 38, 40

    34 Stat. 545 ...........................................................................................................3

25 U.S.C. § 323 ..........................................................................................................31

Okla. Const., art. XVII, § 8 ..........................................................................................3

12 Okla. Stat. § 940(A) ......................................................................................... 48-54

23 Okla. Stat. § 64(3) ................................................................................................48

Osage Nation Const. art. XV, § 3 ...............................................................................39

Osage Nation Const. art. XV, § 4 ...............................................................................39

## Other Authorities

Restatement (Second) of Torts § 162 cmt. E (1965) ...................................................19

Act to Reaffirm the Inherent Sovereign Rights of the Osage Tribe,
118 Stat. 2609 ............................................................................................................39

The Osage Nation Constitution is available at
https://osagenation-nsn.gov/government (last visited July 15, 2025) ....................39

## Regulations

25 C.F.R. Part 211..................................................................4, 9, 11

25 C.F.R. § 211.1 ........................................................................19

25 C.F.R. § 211.3 ............................................................4, 8, 16, 21

25 C.F.R. Part 214.........................................................4, 9, 31, 43

25 C.F.R. § 214.2 ...........................................................................5

25 C.F.R. § 214.7 ..............................................................5, 7, 9, 31, 45

25 C.F.R. § 214.9 ......................................................5, 12, 23-24, 35

25 C.F.R. § 214.10 .........................................................................5

## STATEMENT OF RELATED CASES

Osage Minerals Council appealed the district court's September 30, 2015 order granting summary judgment to Osage Wind, LLC; Enel Kansas, LLC; and Enel Green Power North America, Inc. *United States v. Osage Wind, et al.*, No. 15-5121 (10th Cir. Nov. 30, 2015). OMC also appealed from the district court's February 22, 2016 order denying its motion to intervene. *United States v. Osage Wind, et al.,* No. 16-5022 (10th Cir. Mar. 2, 2016). On September 18, 2017, this Court reversed the award of summary judgment for Enel in No. 15-5121 and dismissed No. 16-5022 as moot. *United States v. Osage Wind, LLC,* 871 F.3d 1078 (10th Cir. 2017). Enel's petition for a writ of certiorari was denied. *Osage Wind, LLC, et al., v. Osage Minerals Council,* S. Ct. No. 17-1237, 586 U.S. 1096 (Jan. 7, 2019).

# GLOSSARY

| | |
|---|---|
| Supp.App. | Appellee's Supplemental Appendix |
| Enel | Osage Wind, LLC; Enel Kansas, LLC; and Enel Green Power North America, Inc. |
| OMC | Osage Mineral Council |
| OME | Osage Mineral Estate |
| BIA | Bureau of Indian Affairs |
| 2017 Decision | *United States v. Osage Wind, LLC*, 871 F.3d 1078 (10th Cir. 2017) |
| 2023 Decision | December 20, 2023, Opinion and Order on cross-motions for summary judgment |
| 2024 Decision | December 18, 2024, Opinion and Order |

**INTRODUCTION**

The United States holds in trust for the Osage Nation a mineral estate within Osage County, Oklahoma. In 2010, Osage Wind, LLC; Enel Kansas, LLC; and Enel Green Power North America, Inc. (collectively Enel) leased surface rights to approximately 8,400 acres of land in Osage County to build a commercial wind farm. The United States and Osage Mineral Council (OMC) repeatedly expressed concern that the project would impair the mineral estate and demanded that construction activities cease until an appropriate permit was approved. Enel nonetheless proceeded with construction of the wind farm. In 2017, this Court concluded that Enel "was required to procure a lease" under Department of Interior (Interior) regulations and remanded for further proceedings. In the eight years since this Court's decision, Enel has still not obtained a lease. In 2023, the district court largely granted the United States' and OMC's motions for summary judgment, concluding that Enel violated Interior regulations and committed trespass, conversion, and continuing trespass, and that declaratory relief, monetary damages, and injunctive relief are appropriate. In 2024, the district court awarded monetary damages and attorneys' fees.

The district court's decision should be upheld. After extensive briefing and a bench trial on damages, the district court correctly determined that Enel's ongoing use of minerals from the Osage Mineral Estate (OME) as backfill to support the

1

wind turbines constitutes a continuing trespass and awarded reasonable damages for its trespass into the OME. The court also fully justified its permanent injunction in the form of ejectment of the wind turbines to end Enel's continuing trespass. Among other considerations, the court correctly held that Enel's refusal to seek a lease—despite directives by Interior, the OMC, and this Court that a lease was required—constitutes irreparable harm to the Osage Nation's sovereignty because Enel's continued refusal establishes a precedent whereby Enel may simply ignore legal requirements for utilizing tribal property and pay modest monetary penalties instead. Finally, the court properly awarded attorneys' fees and costs because the Plaintiffs prevailed on their claims relating to property damage.

## STATEMENT OF THE ISSUES

1.  Whether the district court properly concluded that Enel's ongoing use of minerals from the OME as backfill constitutes a continuing trespass.

2.  Whether the district court properly awarded damages for continuing trespass until the wind farm is removed.

3.  Whether the district court permissively exercised its discretion in granting a permanent injunction requiring removal of the wind farm as a remedy for continuing trespass.

4.  Whether the district court properly held that the Plaintiffs were entitled to attorneys' fees and costs.

## STATEMENT OF THE CASE

### A.    Background

#### 1.    The Osage Mineral Estate

Congress established an Indian reservation for the Osage Tribe (now recognized as the Osage Nation) through the Act of June 5, 1872, ch. 310, 17 Stat. 228. Upon statehood, Oklahoma incorporated the Osage territory as Osage County. Okla. Const., art. XVII, § 8. *See United States v. Osage Wind, LLC*, 871 F.3d 1078, 1082 (10th Cir. 2017) (2017 Decision).

Through the Act of June 28, 1906 (1906 Act), ch. 3572, 34 Stat. 539, Congress severed the surface lands from the subsurface OME in Osage County, Oklahoma. §§ 2-3, 34 Stat. 543. The surface lands were allotted to individual members of the Osage Nation, a federally recognized Indian tribe. *Id*. at 540. Surface owners could sell their allotments (subject to restrictions), and they were granted "the right to use and to lease said lands for farming, grazing, or any other purpose not otherwise specifically provided for herein." § 7, 34 Stat. 545.

By contrast, "the oil, gas, coal, or other minerals" beneath the surface were "reserved to the [T]ribe." § 2, 34 Stat. 543. The United States is the legal trustee of the OME, while the Tribe holds the beneficial interest. *Osage Wind*, 871 F.3d at 1082. The 1906 Act authorized the Tribe to lease the subsurface minerals to others, but only "with the approval of the Secretary of the Interior." § 2, 34 Stat. 543.

"[N]o mining" of Osage minerals is permitted "without the written consent of the Secretary of the Interior." *Id*. at 543-544.

Section 4 of the 1906 Act directed the Secretary to hold in trust the royalties from the OME paid to the Osage Tribe, drawing interest, and to distribute them quarterly on a pro rata basis to the tribal members on the approved roll. 34 Stat. 544. The right to receive a distribution of revenues from the OME is known as a "headright." The OME is administered by the OMC for the headright holders on behalf of the Osage Nation.

Interior has promulgated general regulations for the leasing of tribal lands for mineral development, 25 C.F.R. Part 211, and specific regulations governing the leasing of the solid mineral resources in the OME, 25 C.F.R. Part 214. *See Osage Wind*, 871 F.3d at 1082. The general regulations define "mining" as "the science, technique, and business of mineral development including, but not limited to: opencast work, underground work, and in-situ leaching directed to severance and treatment of minerals." 25 C.F.R. § 211.3. The regulation further provides that in circumstances where the subject mineral is "sand, gravel, pumice, cinders, granite, building stone, limestone, clay or silt," "an enterprise is considered 'mining' only if the extraction of such a mineral exceeds 5,000 cubic yards in any given year." *Id*.

Under the federal regulations, when the Tribe negotiates a lease for use of the OME, the lease is forwarded to Interior. 25 C.F.R. § 214.2. Until Interior approves the lease, "[n]o mining or work of any nature will be permitted upon any tract of land." 25 C.F.R. § 214.7. Leases provide for the payment of advance rentals and royalties to the Tribe. 25 C.F.R. §§ 214.9, 214.10.

### 2.     The Osage Wind Project

In 2010, Appellant Osage Wind, LLC leased surface-use rights to approximately 8,400 acres of land in Osage County to build a wind farm. *Osage Wind*, 871 F.3d at 1083. It did not obtain a lease from the Osage Nation to conduct any mining of the minerals underlying those lands. Enel undertook site preparation work in October 2013. *Id*.

As Enel admits, OMC and Interior contacted it repeatedly about the need for a mineral lease. Opening Br.11. Enel omits several significant communications. In July 2012, Interior contacted the Wind Capital Group regarding the wind development project in Osage County. 6-App.1671. That letter notes that Interior previously recommended that any proposals be submitted to Interior for review to assess the potential impacts on the OME. Supp.App.96. Interior emphasized that it "cannot assist companies in avoiding potential problems with the dominant [OME] that could result in setbacks with the project unless we are fully informed of project activities and locations of wind turbines." *Id*.

In October 2013, the OMC contacted the Wind Capital Group to again request information to allow it and the Bureau of Indian Affairs (BIA) "to determine the federal permitting, leasing and other regulatory requirements that could apply to the Osage Wind Project…." 6-App.1670. That letter requested specific information, including details about excavation plans, the manner in which turbines will be secured in the sub-surface, and placement of materials post-excavation. 6-App.1671.

By September 2014, Enel began building cement foundations in holes ten feet deep and 60 feet wide to support wind turbines at the site. *Osage Wind*, 871 F.3d at 1083. To make room for the foundations, petitioners first removed soil, sand, and rock. *Id*. The nature of the rock encountered required dynamite blasting at 82 of the 84 wind turbine excavation sites. Add.57. After pouring the cement foundation into the resulting holes, petitioners crushed the smaller-sized rock and returned it to the holes surrounding the foundations. *Id*. Enel left the larger rocks sitting on the surface next to the holes. *Id*.

In October 2014, Interior wrote Enel again, stating that an inspector had found a pit in which limestone had been crushed and piled around the wind turbine foundation, and that Agency records reflected no permit "to perform such excavation of minerals." 6-App.1677. That letter directed Enel to "cease further excavation until the necessary permits were obtained and threatened legal action

for non-compliance." Add.61. A few weeks later Interior's Tulsa Field Solicitor asked one question of Enel's attorney: had Enel complied with Interior's cease and desist letter? *See* 5-App.1193-94. In November 2014, the Osage Nation's Acting Principal Chief wrote to Enel requesting it suspend construction of the wind turbines for taking "Osage minerals … without permits or approval of the [OMC]." Add.62.

### B.    The litigation through this Court's 2017 Decision

On November 21, 2014, the United States filed suit to halt Enel's excavation work, claiming that its extraction, crushing, and use of minerals to construct the wind farm constituted "mining" of sand, rock, and gravel under Interior's regulation, which required a mineral lease under 25 C.F.R. § 214.7. *Osage Wind*, 871 F.3d at 1083. After discovering that Enel had completed the excavation, the United States filed an amended complaint on December 12, 2014. *Id*. at 1083-84. The United States sued "in its capacity as trustee of the Osage minerals estate." 1-App.42. The First Amended Complaint claimed violation of federal law, conversion, trespass, and continuing trespass from the unauthorized mining comprised of the construction and operation of the wind farm, and alleged that the wind turbines "will invade and irreparably damage the minerals estate so long as they are in place" (1-App.41 ¶ 18) and that Enel's trespass, continuing trespass, and conversion caused damages to the OME. (1-App.41 ¶¶ 50, 57, 64). The United

States sought declaratory relief, damages, and injunctive relief in the form of an order prohibiting further mining without a lease and removal of "structures or materials placed, without authorization, in the [OME]." 1-App.47-53.

On September 30, 2015, the district court granted summary judgment to Enel, concluding that its excavation work was not "mining" under 25 C.F.R. § 211.3. *Osage Wind*, 871 F.3d at 1084.

In an appeal filed by OMC, this Court reversed, concluding that Enel had engaged in "mining" within the meaning of 25 C.F.R. § 211.3, and therefore required a federally approved lease from the Tribe. *Osage Wind*, 871 F.3d at 1089-92. The Court noted that Interior's general regulations governing leasing of Indian lands for mineral development define "mining" as "the science, technique, and business of mineral development," but rejected the district court's reading of the regulation as limited to "the commercialization of minerals" as "overly restrictive." *Id*. at 1089. The Court agreed that "merely encountering or incidentally disrupting mineral materials" would not fall under the regulation. But it held that Enel's activities involved much more:

> The problem here is that Osage Wind did not merely dig holes in the ground—it went further. It *sorted* the rocks, *crushed* the rocks into smaller pieces, and then *exploited* the crushed rocks as structural support for each wind turbine.

*Id*. at 1091. This Court concluded, after interpreting any ambiguity in the regulation or statute in favor of the Tribe, that Enel's activities thus required a federally approved lease from OMC under 25 C.F.R. § 214.7. *Id*. at 1092.

The Court also rejected Enel's argument that requiring a mining lease conflicts with the 1906 Act, which affords a surface owner "the right to manage, control, and dispose of his or her lands." *Id*. (quoting the 1906 Act § 2). It explained that surface owners remain free to disrupt the OME unless the minerals are "being shipped offsite," "commercialized," or "acted upon for the purpose of exploiting the minerals themselves." *Id*. Moreover, "the BIA has reasonably concluded that *development* of [more than 5,000 cubic yards of common-variety minerals] goes beyond mere use of the surface estate and implicates the [OME] reserved to the Osage Nation." *Id*.

### C.    Proceedings on remand from the 2017 Decision

#### 1.    The 2023 Decision

On remand, OMC intervened as a plaintiff. The parties engaged in extensive discovery. In 2021, the parties cross-moved for summary judgment.

In its December 20, 2023 Opinion and Order on cross-motions for summary judgment (2023 Decision), the district court declared that Enel had violated federal law (25 C.F.R. Parts 211 and 214) and held that it was liable for conversion, trespass, and continuing trespass. Add.17-35. The declaratory judgment was based

on this Court's 2017 Decision. Add.17-18. As for conversion and trespass, Osage Wind and Enel Green Power North America conceded liability, but Enel Kansas denied liability, an argument the district court rejected. Add.15. The court held that Enel Kansas was jointly and severally liable with the other two defendants, noting that the three defendants represented to the Supreme Court in their petition for a writ of certiorari to review the 2017 Decision that they had all undertaken excavation work for the wind turbines. Add.12-21.

With respect to continuing trespass, the court considered the three theories presented by Plaintiffs: (1) the continued "physical presence of foundations for the wind turbines and other structures below ground level"; (2) "the presence of the wind towers" which "creates a mining setback and inhibits the development of the [OME] within a certain radius around the structures"; and (3) continuing use of the minerals as backfill to support the wind turbines. Add.26-29. The court rejected the first and second theories and accepted the third theory as consistent with this Court's 2017 Decision. Add.28-35.

The court then held that it would award damages for conversion and trespass in amounts to be determined after a damages trial. Add.36-37. It further held that the continuing trespass warranted equitable relief in the form of an order of ejectment of the wind farm at a time to be determined after further proceedings. Add.38-45.

10

## 2.     The 2024 Decision

Following its 2023 Decision, the district court ordered Enel to file a brief proposing a plan and schedule for removal of the wind turbines, including plans for rehabilitation of the impacted land. Supp.App.102. Enel submitted a plan and schedule for removal of the wind farm, and, for the first time, offered an alternative—removal of the supporting fill around the base of the turbines. 4-App.1016-39. The Plaintiffs responded. 4-App.1040-58.

In May 2024, the court conducted an eight-day bench trial on damages for Enel's conversion and trespass. 1-App.33-34. The parties submitted post-trial briefs and proposed findings and conclusions limited to the issues of damages for conversion and trespass. 4-App.1109—5-App.1228.

After trial, the court then ordered briefing on two issues: (1) the availability of attorneys' fees and costs, and (2) "whether damages can be granted for the period of time prior to the completion of the equitable relief of ejectment." Supp.App.103-04.

On December 18, 2024, the district court issued a 92-page opinion and order (2024 Decision), awarding the Plaintiffs the following relief: (1) a declaration that Enel violated 25 C.F.R. Parts 211 and 214; (2) $242,652.28 in conversion damages; (2) $66,780 in trespass damages through September 2024 and an additional $8,400 in future trespass damages accruing "on the first day of

September of each subsequent year until the wind towers are removed and the
[OME] is returned"; and (3) ejectment of the Project and returning the OME to its
pre-trespass condition by December 1, 2025. Add.97, 139-40. The court also
awarded $1,943,667 in attorneys' fees and $32,554.08 in costs to the United States,
and $1,822,575.85 in attorneys' fees and $88,891.78 in costs to OMC. Add.140.

The court entered final judgment for the Plaintiffs. Add.141-42. Thereafter,
the district court stayed execution on the judgment and the ejectment pending this
appeal and authorized the posting of a supersedeas bond by Enel in the amount of
$10,036,500.

## SUMMARY OF ARGUMENT

I.      The district court properly found Enel liable for continuing trespass
based on Enel's continuing refusal to apply for a mineral lease even after this
Court's 2017 Decision holding that Enel had violated federal law by undertaking
mineral development without a lease. The court correctly applied the 2017
Decision in holding that Enel required a mineral lease not just for sorting and
crushing the rocks in 2014 but also for continuing to use them as backfill support
for the wind turbines.

II.     The district court properly awarded damages for trespass against the
OME for as long as the trespass continues, looking to 25 C.F.R. § 214.9 as a
reasonable method for calculating a fair rental value of the OME. The court's

12

modest award of $66,780 from September 2014 through September 2024 should be affirmed as should its award of an additional $8,400 per year until the trespass on the OME ends with the removal of the wind towers.

III.    The district court did not abuse its discretion in ordering ejectment of the wind farm as a remedy for Enel's continuing trespass.

A.    Enel argues that the injunction is not narrowly tailored, but Enel waived its right to challenge the scope of the injunction by failing in September 2023 to answer the district court's question whether removing the backfill was a feasible alternative to removing the wind turbines.

B.    The district court did not abuse its discretion in ordering ejectment of the wind farm but instead permissibly ruled that the equitable factors weigh in favor of injunction.

Plaintiffs established irreparable harm to the Osage Nation's sovereignty from Enel's continued refusal to apply for a mineral lease. First, Enel has persisted in bad faith since 2014 by operating the wind farm without a mineral lease. The threat of money damages has been insufficient incentive for Enel to apply for a mineral lease. Second, Enel proves the necessity for an injunction by its argument that its actions have no effect whatsoever on the sovereignty of the Osage Nation. Contrary to Enel's arguments, the OME is tribal trust property over which the Osage Nation has continually exercised its sovereignty, as recognized in the 1906

Act and subsequent federal actions, notably the 2011 settlement of the Osage Nation's breach of trust claim against the United States. Third, Enel misreads this Court's 2017 Decision in arguing that it does not need a mining lease for its continued exploitation of the OME.

The district court similarly did not abuse its discretion in holding that the balance of harms weighs in favor of a permanent injunction of ejectment and that ejectment will not adversely affect the public interest. The district court permissibly concluded that upholding federal statutes and regulations, this Court's 2017 Decision, and the Osage Nation's sovereignty outweigh the speculative harms that may result from ejectment.

IV.    The district court properly awarded the Plaintiffs attorneys' fees and costs for their successful prosecution of all of their claims against Enel. The award was authorized by 12 Okla. Stat. § 940(A), which provides for an award in actions claiming, "damages for the negligent or willful injury to property," are reasonably read in Plaintiffs' complaints.

The district court's 2023 Decision and 2024 Decision should be affirmed.

## STANDARD OF REVIEW

This Court reviews decisions on summary judgment de novo, applying the same standard as the district court. *Tarrant Reg. Water District v. Herrmann*, 656 F.3d 1222, 1232 (10th Cir. 2011). This Court "review[s] the district court's

findings of fact for clear error and its conclusions of law de novo." *Ramos v.*

*Banner Health*, 1 F.4th 769, 777 (10th Cir. 2021). When reviewing factual

findings, this Court "view[s] the evidence in the light most favorable to the district

court's ruling and must uphold any district court finding that is permissible in light

of the evidence." *Id.* (internal quotation marks omitted).

This Court reviews the grant "of a permanent injunction for abuse of

discretion, [] reviewing underlying questions of law de novo." *Crandall v. City &*

*Cnty. Of Denver*, 594 F.3d 1231, 1236 (10th Cir. 2010) (citations omitted).

This Court generally reviews the award of attorneys' fees and costs for

abuse of discretion. *Supre v. Ricketts,* 792 F.2d 958, 961 (10th Cir. 1986).

Underlying factual findings are reviewed for clear error and conclusions of law are

reviewed de novo. *Id.*

## ARGUMENT

### I.    The district court properly found Enel liable for continuing trespass.

After a thorough analysis of the applicable laws and this Court's 2017

Decision, the district court correctly concluded that Enel's ongoing use of the

excavated minerals as backfill to support the wind turbines constituted a continuing

trespass. Add.21-35. Enel does not challenge on appeal the court's holding that it

trespassed in the OME by "entering the mineral estate, extracting minerals, and

using the extracted minerals without first obtaining the necessary lease." Add.20. Because Enel continues its *use* of the OME without a lease, its trespass continues.

This Court has explained that "continuing trespass" is not a distinct legal wrong. *Davilla v. Enable Midstream Partners, L.P.*, 913 F.3d 959, 971 n.8 (10th Cir. 2019). "Rather, the ongoing, unabating nature of certain trespasses *continuously* gives rise to causes of action that the victim can sue on, and eventually can support equitable relief. *Id.* (citing two Oklahoma Supreme Court decisions). The court properly looked to *Davilla* for the legal standard for continuing trespass. Add.22. Further, a continuing trespass is an "unauthorized encroachment upon property that had continued for several years and was likely to continue unless enjoined …" Add.22 (citing *Fairlawn Cemetery Ass'n. First Presbyterian Church, U.S.A. of Okla.*, 496 P.2d 1185, 1187 (Okla. 1972)). The district court summed up the point in its 2023 Decision, the "relevant distinction between a temporary and continuing trespass is that the ongoing nature of a continuing trespass necessitates the need for equitable relief." Add.23.

In concluding that the support for the wind turbines provided by the extracted OME is a continuing trespass, Add.28-35, the district court correctly applied this Court's 2017 Decision. The court explained that this Court, in construing the relevant regulation, 25 C.F.R. § 211.3, "adopted a broad meaning of the terms 'mining' and 'mineral development'" Add.29. Specifically, the Court

interpreted the regulation to provide that "*at the very least* … 'mineral development' *includes, but is not limited to,* action upon the minerals in order to exploit the minerals themselves." Add.30 (quoting *Osage Wind,* 871 F.3d at 1091) (emphasis added). And this Court thus concluded that Enel developed the minerals when it "*sorted* the rocks, *crushed* the rocks into smaller pieces, and then *exploited* the crushed rocks as structural support for each wind turbine." Add.30 (quoting *Osage Wind,* 871 F.3d at 1091-92).

The district court correctly rejected Enel's narrow interpretation "that there can be no continuing trespass because the relevant acts of sorting and crushing of rocks ceased in 2014." Add.30. That interpretation "conflate[s] the support provided by the surrounding [OME] and the support provided by the crushed rocks used as backfill." Add.31. The district court agreed that it "would be an unreasonable restriction on the rights of surface estate owners" "to hold that *passive support* provided to a structure by the surrounding ground constituted mineral development requiring a lease …." Add.31 (emphasis added). But it "does not agree with [Enel's] contention that the support provided by backfill consisting of unlawfully mined minerals is equally innocuous," Add.31, explaining that *Osage Wind* does not "so narrowly … draw a distinction between actively altering the minerals and subsequently using the minerals." Add.32. Reiterating this Court's ruling that, "*at the very least*[,] 'mineral development' *includes, but is not*

17

*limited to*, action upon the minerals in order to exploit the minerals themselves,"

(*Osage Wind*, 871 F.3d at 1091), the district court concluded:

> exploitation of the minerals did not end with the crushing of rocks. It is undisputed that the minerals were pushed back into the holes and actively incorporated into the construction of the wind turbines as backfill. The structures continue to receive the benefit of that backfill support today.

Add.33.

The district court noted this Court's observation that "[w]ithout question, the regulations at issue here are designed to protect Indian mineral resources and 'maximize [Indians]' best economic interests" and interpreted them to effectuate that purpose to include the use of OME as backfill support within "mineral development." Add.35 (quoting *Osage Wind*, 871 F.3d at 1090). For these reasons, the district court correctly ruled that Enel's continued use of the minerals as backfill to support the wind turbines established a continuing trespass warranting equitable relief in addition to the monetary damages caused by the trespass.

Enel's primary challenge to the district court's holding of continuing trespass is that its "sorting and crushing of rocks … indisputably occurred (and concluded) more than a decade ago." Opening Br.25. This challenge fails because Enel simply ignores its ongoing *use* and *exploitation* of the OME as structural support for the wind turbines. As explained above, this Court's 2017 Decision defines mining to include the use or exploitation of the crushed rocks: Enel's

"extraction, sorting, crushing, *and use* of minerals as part of its excavation work constituted 'mineral development.'" *Osage Wind*, 871 F.3d at 1081-82 (emphasis added).

Enel's reliance on the Restatement (Second) of Torts § 162 cmt. E (1965) is unpersuasive. Opening Br.25-26. Enel acknowledged in the district court that this section of the Restatement has not been formally adopted by the Oklahoma Supreme Court. 1-App.228. And comment E does not describe the circumstances presented here. It focuses on the "remov[al of] earth or some other substance from the land," whereas the continuing trespass here is premised on the backfill around the wind turbines, which is not a "permanent[] change[]" to "the physical condition of the land." As explained in Part III below, Enel's continuing use and exploitation of the OME without a mining lease—which is harming the Osage Nation's sovereignty—can be remedied by ejectment of the wind farm. The undisputed facts show that Enel refused in bad faith to seek a lease, willfully trespassed into the OME, converted the OME, and has continually *used* and *exploited* the OME as ongoing support for the turbines. The court reasonably found that this constitutes a continuing trespass interpreting the regulations as this Court did to protect the Osage Nation's minerals, its economic interests, and its sovereignty. *See Millsap v. Andrus*, 717 F.2d 1326, 1329 (10th Cir. 1983); 25 C.F.R. § 211.1(a),(d); *Osage Wind*, 871 F.3d at 1090. Enel argument that there cannot be an "ongoing invasion

of *realty* here," Opening Br.26 (emphasis added), fails for the same reasons. As

Enel points out, the district court "recognized" that "the mere 'presence of

foundations for the wind turbines' in the subsurface is not an ongoing trespass." *Id.*

(quoting Add.26). But as explained above, the court premised Enel's liability for

continuing trespass on its continued use and exploitation of the OME as backfill

support for the turbines, which required a mining lease.

Enel seeks to bolster its argument that there is no continued invasion of

realty with Plaintiff's statement in its Post-Trial Brief relevant to conversion that

the minerals became "tangible personal property" after excavation. Opening Br.27

(quoting 5-App.1165). Enel argues that "use of converted *personal* property cannot

also be a continued invasion of realty," relying primarily on *Lewis v. Steward*, 230

P.2d 455, 459 (Okla. 1951). Opening Br.27-28. That case does not aid Enel here.

The parties in *Lewis* had entered into a lease to mine coal, and plaintiffs sought

damages in conversion for coal allegedly wrongfully taken. *Lewis*, 230 P.2d at 457.

In *Lewis*, the converted coal was not kept on site and used or exploited for other

commercial purposes—it was removed from the mine. *Id*. at 457, 459. And unlike

Enel, no claims of trespass and continuing trespass were at issue because the

defendants had a right to enter or remain via the lease. *Id* at 457. Thus, *Lewis* does

not address the question of whether defendants who are found liable for conversion

*and* trespass should only be required to pay damages for conversion. Nor does

*Lewis* involve the sovereign rights of an Indian tribe or the violation of federal regulations.[1]

Enel's hypothetical based on *Lewis* also misses the mark. In the hypothetical, Enel extracts minerals without the necessary lease, but then transports them out of state for use in building a road. Opening Br.28. Enel asserts that it could not be liable for continuous trespass on those facts and argues that its use of the converted minerals onsite should make no difference because the surface owners have rights to use the surface estate under the 1906 Act. *Id*. This argument was addressed above.

Nor do Enel's final points in Part I, *id*. at 28-29, show any error in the district court's decisions. Enel returns to its argument that the district court unduly expanded this Court's concept of "mineral development" to include ongoing use of the excavated minerals for wind turbine support in the absence of ongoing active alteration. *Id*. at 28 (citing Add.32-33). But this Court took pains to explain that the scope of "mineral development" in 25 C.F.R. § 211.3 is "not limited to" the three examples of active "severance and treatment of minerals." *Osage Wind*, 871 F.3d at 1090-91. This Court even reiterated that point: "at the very least … 'mineral development' includes, *but is not limited to*, action upon the minerals in order to

---

[1] Enel also cites *Davilla*, 913 F.3d at 966. Opening Br.27. However, *Davilla* supports the court's holding of continuous trespass.

exploit the minerals themselves." *Id.* at 1091 (italicization altered). And Enel's closing point that it was this asserted error that resulted in the ejectment injunction, Opening Br.29, completely ignores that it is Enel's continued disregard of the Osage Nation's sovereignty and federal law in refusing to apply for a mining lease that necessitated the injunction, as explained in Part III below. Enel's use and exploitation of the rocks as structural support continues—without a lease and in derogation of the Tribe's sovereignty—and the court properly found Enel liable for continuing trespass.

## II.    The district court properly awarded damages for trespass against the OME for as long as the trespass continues.

The district court properly tied Enel's trespass damages to the regulatory requirements that Enel continues to circumvent through its ongoing mining activities.[2] Until the wind farm is removed, trespass damages will accrue for Enel's ongoing use and exploitation of the OME commensurate with the applicable lease regulations Enel actively avoids. The court awarded damages for trespass against the OME based on "the fair rental value of the [OME] occupied by Defendants." Add.96. Although the court agreed with Plaintiffs that reasonable or fair rental

---

[2] The district court did not award "continuing trespass damages." Opening Br.29-30 (four instances). It warned about conflating the injury suffered from Enel's continuing trespass (impaired sovereignty) with the injury suffered as a result of Enel's trespass against the OME, which can be cured through a monetary award accruing until the ejectment of the wind towers is complete. Add.116.

value was a proper valuation of damages for trespass, it confirmed "determining a reasonable fair market rental value for the [OME] is challenging." Add.94, 96. The court ruled the "regulations applicable to the management of the [OME] provided a more reasonable method of calculating a fair rental value" than the terms in the leases Enel negotiated with its wind farm's surface landowners. *See* Add.96.

The court looked to 25 C.F.R. § 214.9, which requires lessees pay specified advance rental rates. Add.96. Enel's decade of trespass through September 2024, based on the wind farm's 8,400-acre footprint, amounted to $66,780 in trespass damages, "with an additional $8,400 to accrue on the first day of September of each subsequent year until the wind towers are removed and the [OME] is returned to Plaintiff." Add.97.

While the reservation of the OME in Osage County and the other facts of this case are unique, the court found other cases involving trespass against Indian surface property persuasive, including *Oneida Cnty. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 229-33 (1985) (affirming trespass damages against Indian land based on "fair rental value of the land"). Add.95-96.

The court explained the rates in 25 C.F.R. § 214.9 "represent[] the value of the [OME] prior to development and mineral extraction," Add.96, ruling that the "trespass claim concerns the unlawful occupancy of the [OME] and the conversion claim concerns the unlawful development." Add.96-97. Rejecting Enel's "position

that because Plaintiff's trespass and conversion claims arose from common facts, the two claims resulted in the same injury," the court reasoned "conversion occurred through limited discrete acts of removing and acting upon extracted minerals" and "[t]respass was a prolonged occupation of the [OME], preventing its use by other parties." Add.94-95.

Enel argues the court was wrong concluding that mining is ongoing because construction end in 2014. Opening Br.29. Rather than accepting the 2017 Decision's holding that mining includes the *use* of converted minerals, Enel glosses over the law of the case and reframes its ongoing mining as mere possession of converted OME. *Id*. Enel attacks the court's reliance on Section 214.9 for fair rental value as simply credits on royalties of production. Considering Enel refuses to obtain the required minerals lease for its ongoing OME mining, the court's application of the existing regulation authorizing advance rental payments—with no royalty credits coming in to offset them—is inherently conservative and a tremendous bargain for a bad-faith trespassing international corporation. Add.102-12.[3] Lessees pay advance rental payments to the OMC for

---

[3] While Enel refers to its continued failure to procure a lease as a "simple trespass," the district court ruled otherwise:

> Based on the testimony of [Enel's] representative and the evidence presented at trial, it is clear that [Enel's] decision to move forward with construction of the wind farm was motivated by financial interests and not a legitimate belief in the legality of their actions.

Add.112.

the *right* to mine the OME, regardless of what production results or what royalties are generated. The court's trespass damages were calculated reasonably, are conservative, and should be affirmed.

### III.    The district court did not abuse its discretion in ordering injunctive relief as a remedy for Enel's continuing trespass.

The district court concluded in its 2023 Decision that Enel's continued use of the Osage minerals it mined without authorization in 2014—and without thereafter obtaining a mining lease—constitutes continuing trespass warranting permanent injunctive relief in the form of ejectment of the wind towers. Add.38-45. As explained below, the court did not abuse its discretion in concluding that the prerequisites for permanent injunctive relief had been established or in deciding that removal of the wind towers was the appropriate relief. The only issue to be decided thereafter was the appropriate deadline to complete the removal. In its 2024 Decision, the court rejected as untimely Enel's belated proposal to replace the backfill around the wind towers in lieu of removing the towers. Add.115. As explained below, the court similarly did not abuse its discretion in that ruling.

As explained in Part I above, Plaintiffs' entitlement to injunctive relief flows from the district court's holding that Enel is liable for continuing trespass. By December 2023 when the court ruled on the summary judgment motions, Enel had been ignoring the Plaintiffs' demands to apply for a mining lease for ten years. Enel's continued refusal either to obtain a mining lease or to cease its use of the

illegally extracted minerals even after this Court's 2017 Decision that Enel violated federal law constitutes continuing trespass that "support[s] equitable relief." *Davilla*, 913 F.3d at 971 n.8. And the district court permissibly concluded that ejectment was the appropriate remedy.

On appeal, Enel makes two arguments: (1) Plaintiffs failed to establish the prerequisites for the permanent injunctive relief the district court ordered, Opening Br.30-43; and (2) the tower-removal injunction was not narrowly tailored, *id.* at 43-45. As explained below, the first argument is unpersuasive, and Enel waived the second argument in September 2023 by declining to answer the district court's question whether backfill replacement was a feasible remedy. We address the second argument first because the court's conclusion that the injunction prerequisites were met must be assessed in light of that waiver.

### A.      Enel waived the right to challenge the scope of the injunction.

Enel waived its right to challenge the scope of the injunction by declining the district court's invitation to address backfill replacement as an alternative to tower removal at the scheduled September 20, 2023 hearing on the summary judgment motions. On August 30, 2023, the court requested that the parties address six questions at the hearing, including Question No. 5:

> Would it be possible to remove and replace the backfill without completely removing the wind towers? Would removal of the wind

> towers conclude the continuing trespass if the minerals have already
> been extracted and altered?

Supp.App.99. Counsel for the United States stated that he "hope[d] that they would

be able to remove the backfill … and leave their turbines in place," but "[t]hat's

really more for the defendants to answer whether they can do it or how much it's

going to cost." Supp.App.108-09 at 123:25–124:10 (Fields). He further stated that

removing the wind towers would end the continuing trespass. Supp.App.109 at

124:20-23. Counsel for OMC stated that the defendants' brief "seems like they're

certainly assuming [that replacing the backfill is] not possible," but that he had not

seen "anything that was definitive." Supp.App.110 at 138:19-22 (Rasmussen). He

agreed that removing the wind towers would end the continuing trespass.

Supp.App.111 at 139:6-8. Counsel for Enel declined to answer the question

whether it was possible for Enel to remove and replace the backfill without

removing the wind towers, instead reiterating Enel's arguments that there was no

continuing trespass and that no injunctive relief was warranted. Supp.App.109-15

at 139:20-145:11) (McCormack). He asserted that "removing … the fill … has not

been pled by anybody[], … has not been sought by the U.S. Government or the

OMC, and … it has not been the subject of any discovery … as to whether that is

technically feasible or not." Supp.App.111-17 at 139:24-140:4. He added: "And as

I sit here right now, I can't answer the question of whether it's feasible or not. I

don't know." Supp.App.113 at 141:1-4.

The district court ruled in its 2023 Decision that removal of the wind towers was the appropriate relief. Add.44-45. At that point, the only open issue was the date on which the tower removal could reasonably be accomplished. A month after issuing its 2023 Decision, the court asked Enel to "propos[e] a plan and schedule for the removal of the wind turbines," allowing Plaintiffs to respond. Supp.App.102. In its February 22, 2024 response, Enel addressed for the first time the backfill-replacement remedy. App.1041-44. In its 2024 Decision, the court rejected Enel's belated argument as a "backdoor attempt to seek reconsideration of the prior grant of injunctive relief." Add.113-14.

On appeal, Enel simply ignores the district court's holding that it needed to present its backfill-replacement theory in its summary judgment briefs or at the September 2023 hearing on the summary judgment motions. *See* Opening Br.43-45. Enel has thus forfeited its right to challenge the court's rejection of its backfill-replacement proposal on this procedural ground. *Platt v. Winnebago Indus., Inc.*, 960 F.3d 1264, 1271 (10th Cir. 2020) ("failure to raise an issue in an opening brief waives that issue").

In any event, the district court did not abuse its discretion in holding Enel to the trial procedure it had established. *See Garza v. Davis*, 596 F.3d 1198, 1205 (10th Cir. 2010) ("District courts generally are afforded great discretion regarding ... control of the docket and parties[ ], and their decisions are reviewed only for

abuse of discretion." (internal quotation marks omitted)). The court specifically advised the parties weeks in advance that they should be prepared at the summary judgment hearing to discuss the viability of the backfill-replacement alternative. When Enel declined to say whether that was a viable alternative remedy, it effectively left the court with no choice other than complete removal of the wind farm if it concluded that equitable relief was warranted to remedy the continuing trespass. Until the court's adverse 2023 Decision, Enel presented an all-or-nothing defense, apparently holding back the backfill-replacement alternative with the hope that the court would decide not to issue any injunction and saving it the cost of replacing the backfill.

Enel thus waived in the district court an argument that the injunction should have been more narrowly tailored. "Failure to raise an issue in the district court generally constitutes waiver." *Rios v. Ziglar*, 398 F.3d 1201, 1209 (10th Cir. 2005). As this Court noted in *Tele-Communications, Inc. v. Commissioner of Internal Rev.*, 104 F.3d 1229 (10th Cir. 1997):

> Propounding new arguments on appeal in an attempt to prompt us to reverse the trial court undermines important judicial values. In order to preserve the integrity of the appellate structure, we should not be considered a "second-shot" forum, a forum where secondary, back-up theories may be mounted for the first time. Parties must be encouraged to give it everything they've got at the trial level. Thus, an issue must be presented to, considered [and] decided by the trial court before it can be raised on appeal.

*Id.* at 1233. This waiver rule "is particularly apt" in the context of appeals from the granting of summary judgment, "because the material facts are not in dispute and the trial judge considers only opposing legal theories." *Id.*; *see also Gale v. City & Cnty. of Denver*, 962 F.3d 1189, 1194 (10th Cir. 2020) (holding the preemption issue waived).

## B.     An injunction was warranted.

The district court applied the standard set forth in *Davilla*, 913 F.3d at 973, for granting equitable relief against a party found liable for a continuing trespass. Add.38-39. In *Davilla*, Indian allottees in Oklahoma sued a natural gas pipeline company for trespass after its easement expired. This Court held that "a federal district court's decision to permanently enjoin a continuing trespass on allotted land should take into account (1) whether an injunction is necessary to prevent irreparable harm, (2) whether the threatened injury outweighs the harm that the injunction may cause to the enjoined party, and (3) whether the injunction would adversely affect the public interest." *Id.* (citing *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014)) (internal quotation marks omitted).[4] After finding Enel

---

[4] *Davilla* addressed the standard governing a decision to order ejectment for continuing trespass—the general federal standard for granting equitable relief or the simplified Oklahoma standard for ordering ejectment for continuous trespass. Under the Oklahoma standard, a plaintiff seeking ejectment of a trespasser need only prove (1) it is entitled to possession of the property, (2) defendant physically entered or remained, and (3) defendant lacked a legal right to enter or remain. *See Davilla*, 913 F.3d at 963. In *Davilla*, this Court departed from the "presumption

liable for continuing trespass, the court applied the *Davilla* standard in ordering Enel to remove the wind towers. Enel has not demonstrated any abuse of discretion in that order.

### 1. The Plaintiffs established harm from Enel's continuing trespass that cannot be prevented or remedied by money damages.

The district court found that Enel harmed and continues to harm the Osage Nation's sovereignty by mining minerals and continuing to exploit these minerals as backfill for its wind towers without obtaining a federal mining lease as required by 25 C.F.R. § 214.7. Add.39-42. Because Enel still refuses to apply for a mining lease under 25 C.F.R. § 214.7, the court further found that the harm can be remedied only by removing the wind towers. Add.39-42. As explained in Part III.A above, Enel waived its opportunity to address the feasibility of replacing the backfill as an alternative remedy.

---

that state law should be incorporated into federal common law," *id*. at 971, because "nationwide application" of 25 U.S.C. § 323, the statute providing for Interior approval of easements over Indian lands which is applied in many states, "suggests a need for a uniform federal standard," *id*. at 972. Conversely, the regulation at issue here, 25 C.F.R. Part 214, applies only to Osage County, Oklahoma. Plaintiffs argued below the court could order ejectment under the Oklahoma standard, which is satisfied here. *See* 4-App.915-16. This Court may uphold the district court on the alternative ground that ejectment was proper under the Oklahoma standard. *See Davilla*, 913 F.3d at 969 (this Court has "discretion to affirm on any sufficient ground that parties have had an opportunity to address").

The court succinctly stated the facts underlying its finding that Enel disregarded the sovereignty of the Osage Nation:

> Defendants were advised by the [BIA] and the [OMC] on multiple occasions that the wind farm project required a lease related to the [OME].[5] [] Defendants failed to obtain the required lease. The Tenth Circuit Court of Appeals held in 2017 that a lease was required. <u>Osage Wind</u>, 871 F.3d at 1087–93. Even following the appellate court's ruling, Defendants have taken no steps to obtain a lease during the years following the appellate court's opinion.

Add.41-42. And the court persuasively explained why that harm can be repaired only through an injunction:

> On the record before the Court, it is clear that Defendants are actively avoiding the leasing requirement. Permitting such behavior would create the prospect for future interference with the [OMC]'s authority by Defendants or others wishing to develop the [OME]. The Court concludes that Defendants' past and continued refusal to obtain a lease constitutes interference with the sovereignty of the Osage Nation and is sufficient to constitute irreparable injury.

Add.42.

The court's 2024 Decision provides additional support for the propriety of the permanent injunction. The court held that Enel's refusal to apply for a mining lease was not based on good faith reliance on the advice of its counsel. Add.102-12. To the contrary, Enel repeatedly disregarded the sovereign rights of the Osage Nation by its bad faith refusal to apply for a mining lease. Enel devotes six pages of its Statement of the Case to a narrative it had developed to support its

---

[5] The court cited the letters discussed above (pp. 5-7).

affirmative defense that its decision not to apply for a mining lease in 2013 or 2014 was based on good faith reliance on advice of counsel. Opening Br.11-17. Enel fails to advise the Court, however, that the district court had thoroughly reviewed that narrative and rejected it. Add.102-12. Enel discusses the October 9, 2014 letter from BIA Superintendent Robin Phillips but fails to acknowledge that BIA had "directed Defendants to cease further excavation until the necessary permits were obtained." Compare Opening Br.14 with Add.103. Weighing the trial testimony of several Enel executives and counsel about the refusal to apply for a mining lease, the court concluded:

> Defendants disregarded these governmental mandates and continued with construction. It is apparent that this decision was the product of a desire to maximize financial gains by Defendants' representatives, while recklessly disregarding the risks of infringing upon the mineral rights of the Osage Nation. When asked to explain the decision to disregard the [BIA's] cease-and-desist instruction, multiple representatives for Defendants indicated that they simply believed that the [BIA] and [OMC], the organizations responsible for administering the [OME], were wrong to require a permit and needed to be better educated on the topic.

Add.104.

The court carefully reviewed the history of the legal memoranda, Add.105-11, and concluded that Enel's "bad-faith reliance on the advice of counsel cannot excuse its willful and wrongful intent":

> Based on the testimony of Defendants' representative and the evidence presented at trial, it is clear that Defendants' decision to move forward with construction of the wind farm was motivated by

> financial interests and not a legitimate belief in the legality of their actions. Defendants viewed the Modrall Sperling memoranda not as statements of law, but as tools to entice investors and as a potential shield against the consequences of Defendants' actions.

Add.112. Although the court addressed this trial testimony in its 2024 Decision on Plaintiffs' claim for treble damages, it also supports the propriety of the court's order of ejectment to remedy the harm to the Osage Nation's sovereignty.

Enel challenges the district court's finding of irreparable harm on three grounds: (1) any harm will be remedied with monetary damages, (2) the Project does not interfere with tribal sovereignty, and (3) Enel only needed a tribal mining lease in 2014 for the installation of the wind towers. Opening Br.31-39. None of these arguments has merit.

### a. Money damages are not an adequate remedy for Enel's refusal to apply for an Osage mining lease.

Enel conceded liability for conversion and both sides offered experts to testify on the calculation of conversion damages at trial. The district court awarded damages for conversion based on the royalties that would have been due on the excavated minerals, totaling $242,652.28. Add.85-92.

Enel also conceded liability for trespass but argued that no additional damages were warranted. Add.95. The court disagreed, explaining that "conversion occurred through limited discrete acts of removing and acting upon extracted minerals," while "[t]respass was a prolonged occupation of the [OME], preventing

its use by other parties." *Id*. As explained in Part II above, the court awarded trespass damages based on "the fair rental value of the [OME] occupied by Defendants." Add.94-95. Looking to the "advance rental" rate in 25 C.F.R. § 214.9 as a reasonable method, the court calculated an award of $66,780.00 in trespass damages through September 2024, with an additional $8,400 payable each year "until the wind towers are removed and the [OME] is returned to Plaintiff." Add.96-97. The additional payment was not expected to be significant as the court ordered the towers to be removed by December 1, 2025. Add.115.

Enel argues that the award of the additional $8,400 per year constitutes "*continuing* damages for any continuing trespass" and that "the district court ordered OMC to be fully compensated with monetary damages" for the claims of both past trespass and continuing trespass, thus precluding any injunctive relief. Opening Br.32-33. This Court should reject that argument. The district court plainly did not view the modest trespass damages as a remedy for Enel's continuing willful trespass in disregard of Osage sovereignty.

In its 2023 Decision, the court rejected Enel's argument that the only injury OMC suffered was "the loss of royalties" from the mined materials used as backfill, which Enel asserted was "compensable though monetary damages." Add.39-40. The court noted that "this approach might be appropriate in an ordinary commercial case," but "[t]he [OMC] is an extension of the Osage Nation's

35

government and the Court must consider the non-economic impacts of Defendants'

unlawful conduct on the Osage Nation's tribal rights." Add.40. Based on the

record, it was "clear" to the court "that Defendants are actively avoiding the

leasing requirement," and that Enel must face real consequences for that refusal to

discourage "future interference with the Osage Mineral Council's authority."

Add.42. An award of trespass damages and an injunction to prevent continuing

trespass are complementary remedies. *See*, *e.g.*, *United States v. Pend Oreille Cnty.*

*Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1549-1552 (9th Cir. 1994) (holding that the

district court could permissibly award both damages for flooded land and an

injunction to enjoin future flooding); *United States v. Pend Oreille Cnty. Pub. Util.*

*Dist. No. 1*, 135 F.3d 602, 608-14 (9th Cir. 1998) (upholding the district court's

computation of damages and injunction ordering the defendant to drop the

reservoir level to end its trespass).

In its 2024 Decision, the court underscored that money damages and

injunctive relief serve different purposes. Add.115-16. The court agreed with Enel

that "[i]njunctive relief is appropriate only to prevent irreparable harm that cannot

be satisfied through a monetary award. Add.115 (citing *Schrier v. Univ. of Colo.*,

427 F.3d 1253, 1267 (10th Cir. 2005)). It explained that "the injury caused by

Defendants' continuing trespass was the interference to the Osage Nation's

sovereignty, which a monetary award cannot cure," adding that "[t]he injury

36

suffered as a result of Defendants' continuing trespass should not be conflated with the injury suffered as a result of Defendants' trespass against the [OME], which can be cured through a monetary award and will continue to accrue until the ejectment of the wind towers is complete." Add.116.

Enel makes no effort in Part III.A.1 of the Opening Brief to argue that the court's rationale for an injunction in addition to limited trespass damages is invalid. In Part III.A.2, however, Enel disputes that the sovereignty of the Osage Nation is at issue.

### b. Enel's refusal to apply for a mining lease interferes with Osage tribal sovereignty.

This Court has "repeatedly stated that ... an invasion of tribal sovereignty can constitute irreparable injury." *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) (quoting *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006)). Enel's argument that its continued disregard of tribal and federal authority does not implicate Osage tribal sovereignty, Opening Br.33-37, flies in the face of federal statutes and regulations and this Court's precedent. This Court can readily reject Enel's specific arguments that the OMC has no sovereign authority and that the interests of the "ultimate owners of the mineral rights" (called "headright holders") do not count as they assertedly are merely "private beneficiaries" which include some non-Osage individuals and entities. *See* Opening Br.34-35.

The Osage Nation is a federally recognized Indian tribe, and as such, has inherent authority over its members and its territory. *See*, *e.g.*, *United States v. Mazurie*, 419 U.S. 544, 557 (1975). As explained above (pp. 3-4), Congress set aside and reserved the minerals in the area now known as Osage County, Oklahoma to the Osage Nation, which minerals are still held by the United States in trust for the benefit of the Osage Nation. The 1906 Act acknowledged the "general tribal authority" of the tribal government without limitation "to mineral administration or any other specific function." *Osage Nation v. Irby*, 597 F.3d 1117, 1120 (10th Cir. 2010). Prior to the 2006 tribal constitution, the minerals "reserved to the tribe" were leased "by the Tribal Council with approval of the Secretary." *Millsap,* 717 F.2d at 1328.

Section 4 of the 1906 Act directed the Secretary to hold in trust the royalties from the OME that were paid to the Osage Nation, drawing interest, and to distribute them quarterly on a pro rata basis to the tribal members on the approved roll. 34 Stat. 544. The right to receive a distribution of revenues from the OME is known as a "headright." The original headrights have become fractionated through time as they were transferred to heirs and devisees. Headrights were for many years transferable to non-Osage persons and entities with limited restrictions, but in 1978 Congress "placed strict limits on the transfers of headrights to non-

Osages." *Fletcher v. United States*, 153 F. Supp. 3d 1354, 1370-71 n.16 (N.D. Okla. 2015).

In 2004, Congress passed An Act to Reaffirm the Inherent Sovereign Rights of the Osage Tribe to Determine Its Membership and Form of Government, 118 Stat. 2609. *See Irby*, 597 F.3d at 1121. Under the Osage Nation Constitution adopted in 2006, the Nation is governed by a legislative branch, an executive branch, and a judicial branch.[6] Exercising its inherent sovereignty, the Nation's Constitution established an eight-member OMC elected by tribal members who hold headrights. Art. XV, § 3. The OMC is "an independent agency within the Osage Nation" that exercises the Tribe's authority to manage the OME in accordance with the 1906 Act, as amended, and to "respect[] and protect[]" the "right to income from mineral royalties." Art. XV, §§ 3 and 4.

In accordance with congressional direction and the Osage Nation's actions, the United States recognizes the sovereign authority of both the Osage Nation and the OMC over the OME. Notably, Section 4(1) of the 1906 Act requires that "all moneys found to be due said *Osage tribe of Indians* on claims against the United States, after all proper expenses are paid, shall be ... placed to the credit of the individual members of the said Osage tribe on a basis of a pro rata division ...." 34

---

[6] The Osage Nation Constitution is available at https://osagenation-nsn.gov/government (last visited July 15, 2025).

Stat. 539, 544 (emphasis added). When the Osage Nation sued the United States in the Court of Federal Claims seeking damages for alleged mismanagement of the OME and Osage Tribal Trust Account, it was recognized as the proper party to make the claim for the benefit of the headright holders. *Osage Tribe of Indians of Oklahoma v. United States*, 85 Fed. Cl. 162, 174 (2008) (rejecting a motion to intervene by eight headright holders).

The United States acknowledged the respective authority of three components of the Osage Nation when it settled that litigation through the Osage Tribal Trust Settlement Agreement, executed on October 14, 2011. *See Fletcher v. United States*, CFC No. 1:19-cv-01246, ECF 7-1 (filed Dec. 20, 2019). The Osage Nation was represented in the negotiations by representatives from the OMC, the Osage Nation Congress, and the Osage Nation Executive Branch. *Id*. at ECF p. 3 (Agreement § 1.g). The Osage Nation provided the waiver and release of claims "on behalf of itself and the Headright Holders." *Id*. at ECF p. 11 (Agreement § 7.a.i). And the Agreement provides for coordination between the United States and OMC regarding the management of the OME. *Id*. at ECF p. 19 (Agreement § 9).

Enel's characterization of the Osage Nation's interest in the OME as "purely proprietary" and "not 'sovereign' in the least," Opening Br.37, is refuted by the above recitation. And Enel's argument that "the Osage Nation is not a party to this

40

action," Opening Br.36, disregards the fact that this Court recognized that OMC is "acting on behalf of the Osage Nation." in this litigation. *Osage Wind*, 871 F.3d at 1081. The district court has similarly described this suit as an action by the United States and the "Osage Nation." *See*, *e.g.*, Add.1, 49.

Nor do Enel's supporting arguments undermine the court's conclusion that Enel's refusal to apply for a mining lease offends tribal sovereignty. Enel argues that the Osage Nation has no sovereign authority over the OME because it lacks the power to "exclude" the construction of wind turbines if the excavated minerals are removed from Osage County and are not used as backfill support. Opening Br.35 (citing Add.84). Of course, Enel did use the excavated minerals as backfill support, triggering the requirement for a mining lease. And Enel is wrong on the law. In its 2023 Decision, the court correctly explained that "[t]ribal authority over the activities of non-Indians on reservation lands" is generally understood to include the power "to exclude outsiders" and "to set conditions on entry." Add.41 (citations and internal quotation marks omitted). Even if the Osage Nation could not exclude a wind farm or similar development from the OME in all circumstances, it had the power to set a condition on mining the OME—i.e., obtaining a lease. A tribe has "general authority, as sovereign, to control economic activity within its jurisdiction." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137 (1982). *Merrion* addressed the power to tax, which the Supreme Court

recognized as "an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management." *Id*. Requiring a mining lease for tribal resources is similarly "an essential attribute of tribal sovereignty." *Id*. Like the power to tax, leasing authority "does not derive solely from the Indian tribe's power to exclude non-Indians from tribal lands." *Id*.

The facts that this Court held that the Osage Reservation has been disestablished, Opening Br.36 (citing *Irby*), and recognized that surface owners have authority to develop their land, *id*. (citing *Osage Wind*, 871 F.3d at 1092), do not call the injunction into question as the OME is tribal trust property over which the Osage Nation has continually exercised sovereignty. *See* 1906 Act, § 2; *Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1272 (9th Cir. 1991) ("The whole purpose of trust land is to protect the land from unauthorized alienation.").

Finally, Enel acknowledges that courts have in many cases concluded that injunctions were justified where state assertions of authority interfered with tribal self-government. Opening Br.36-37. But Enel asserts that there is no similar case in which a court has held that a private actor's trespass on tribal property may be enjoined. *Id*. at 35 n.4. Enel is incorrect. The Supreme Court long ago held that "an action of ejectment could be maintained on an Indian right to occupancy and use," characterizing that principle as "not open to question." *Marsh v. Brooks*, 49 U.S.

223, 232 (1850). Courts continue to issue injunctions to remedy trespass on Indian lands. *See*, *e.g.*, *Swinomish Indian Tribal Cmty. v. BNSF Railway Co.*, 951 F.3d 1142, 1160-61 (9th Cir. 2020) (holding that the tribe had the right to seek injunctive relief to enjoin the railroad's operation in violation of a right-of-way easement); *Pend Oreille*, 135 F.3d at 614 (upholding the district court's injunction ordering the defendant to drop the reservoir level to end its trespass).

### c.    Enel requires a mining lease for its continued exploitation of the Osage minerals.

Enel reiterates its argument that this Court's 2017 Decision

 addressed only whether Enel had to obtain a mining lease for its 2014 activities and did not hold that Enel thereafter required a mining lease for the continued use of the backfill as support for wind towers. Opening Br.38. Part I above explains why that argument is incorrect. Contrary to Enel's assertion that the court's holding of continuing trespass is "fundamentally inconsistent with this Court's definition of mining," *id.*, the court properly implemented the 2017 Decision. And contrary to Enel's assertion that the court's holding that Enel is flouting the Osage Nation's right to control its OME "blinks reality," *id.*, it is Enel's professed ignorance of "any mechanism" it could use to apply for a mining lease that "blinks reality." Enel can apply for a mining lease using the procedures in 25 C.F.R. Part 214.

## 2.     The balance of harms weighs in favor of the permanent injunction ejecting the wind farm.

In its 2023 Decision, the district court identified the harm to Plaintiffs as Enel's "infringement on the self-governance of Indian lands," Add.43, in derogation of the "paramount federal policy that Indians develop independent sources of income and strong self-government," Add.42 (quoting *Seneca-Cayuga Tribe of Okla. v. State of Okla. ex rel. Thompson,* 874 F. 2d 709, 716 (10th Cir. 1989)). The court identified the harm to Enel as the monetary loss from removing the wind towers, which was admittedly "significant."[7] Add.42-43. In light of "the fact that Defendants have ignored opportunities to address the failure to procure a lease over the last decade," including in the years since this Court's 2017 Decision required Enel to obtain a mining lease, the court "conclude[d] that the balance of harms weighs in favor of Plaintiff." Add.43.

On appeal, Enel states that its economic loss is great, and that OMC is suffering no monetary loss beyond those compensated through the damages awarded for conversion and trespass.[8] Opening Br.39-40. Even assuming this is true, the court permissibly concluded that Enel should bear the burden of its business decision to refuse to apply for a mineral lease, particularly after this

---

[7] In 2025, Enel revised its 2021 estimate of monetary loss from about $230 million to about $160 million. *See* Opening Br.39-40 n.5.

[8] Although the court did not award all damages Plaintiffs requested, Plaintiffs are not appealing the conversion and trespass damages amounts.

Court's 2017 Decision. Courts regularly require defendants like Enel to bear the costs of their business decisions. When "sophisticated" corporate officers make a "business judgment" knowing "that there was substantial risk," a court is "not at liberty to 'second guess' their cost-benefit analysis." *First Pennsylvania Bank, N.A. v. E. Airlines, Inc.*, 731 F.2d 1113, 1122 (3d Cir. 1984). "Having made their bed they must lie in it." *Id*. This principle has been specifically applied by courts evaluating the equitable factors for injunctive relief. *See Tenn. Valley Auth. v. Jones,* 199 F. Supp. 3d 1198, 1205-06 (E.D. Tenn. 2016) (disregarding statutory authority results in irreparable harm even when offending party's "costs are entirely the result of their 'act now, ask for forgiveness later' approach."); 3-App.839-40.

Enel is apparently betting that this Court (or the Supreme Court if this Court affirms the district court) will hold that 25 C.F.R. § 214.7 does not require it to obtain a mining lease for continued use of the backfill as support for the wind towers, even though this Court's 2017 Decision is properly read to so hold.

Enel then reiterates its argument, refuted above, that it has not affected Osage tribal sovereignty in any way. Opening Br.41. After taking infringement of tribal sovereignty out of the equation, Enel not surprisingly asserts that "[t]he balance of harms tips decidedly" in its favor, citing five cases in which the Supreme Court or this Court denied an injunction that would have caused the

defendant monetary loss. Opening Br.41-42. Of course such cases exist, but Enel's discussion is not illuminating as Enel does not discuss the harm claimed by the plaintiff in each case. None of the cited cases involve willful disregard of an Indian tribe's authority over its territory.[9] Enel has not demonstrated that the district court abused its discretion in concluding that the balance of harms favors an injunction.

### 3.    The permanent injunction will not adversely affect the public interest.

In Plaintiffs' view, "ejectment would serve the public interest by protecting the sovereignty of the Osage Nation." Add.43. Enel argued, in contrast, that ejectment would cause "loss of revenue for two public schools, jobs, income for the surface estate owners, and renewable energy for 50,000 homes." Add.43. In its 2023 Decision, the court explained that the wind farm had only 10 permanent employees and that the projected reductions in school revenue and surface-owner income were far from certain. Add.43-44. The court concluded that, even if ejectment did cause negative effects, "such effects would not negate the public interest in private entities abiding by the law and respecting government sovereignty and the decisions of courts." Add.44. In its 2024 Decision, the court

---

[9] In *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531 (1987), Alaska Native villages claimed oil development on the Outer Continental Shelf would adversely affect their subsistence hunting and fishing. The Supreme Court held injury to these subsistence resources was "not at all probable," *id*. at 545, and that the villages had no statutory subsistence rights on the Outer Continental Shelf, *id*. at 546-52.

rejected Enel's belated attempt to challenge the ejectment remedy and explained that Enel's reiterated arguments regarding "the claimed benefits of the wind farm continuing to operate" were "not more impactful now than they were" previously. Add.113. The court was well within its discretion in concluding that the public interest favors an injunction.

This Court has concluded that an injunction to protect tribal self-government may serve the public interest. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1253 (10th Cir. 2001); *see also Seneca-Cayuga*, 874 F.2d at 716 ("injunction promotes the paramount federal policy that Indians develop independent sources of income and strong self-government."). More broadly, this Court has explained that enforcing federal law—such as the statute and regulations protecting the OME—serves the public interest: "democratically elected representatives ... are in a better position than this Court to determine the public interest[;] … [t]he courts' peculiar function is to say what the law is, not to second-guess democratic determinations of the public interest." *Fish v. Kobach*, 840 F.3d 710,755 (10th Cir. 2016) (internal quotation marks omitted). While acknowledging that "courts should exercise their traditional equitable practices in evaluating requests for injunctive relief for violation of a federal statute, those practices are 'conditioned by the necessities of the public interest which Congress has sought to protect.'" *Id*. (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982)).

On appeal, Enel recaps the arguments it made below and cites four cases in which this Court or another circuit court decided that the public interest would be served by denying injunctions preventing development of energy projects. Opening Br.42-43. Once again, Enel does not discuss the nature of the countervailing harm to plaintiffs or other case-specific circumstances. Enel has not demonstrated that the court abused its discretion in concluding that it was not contrary to the public interest in this case to require adherence to the federal law governing the OME and this Court's 2017 Decision interpreting that law.

The amicus briefs supporting Enel elaborate on the arguments Enel presented but similarly fail to demonstrate the court abused its discretion when evaluating the public interest.

## IV.    The district court properly awarded the Plaintiffs attorneys' fees and costs.

In its 2024 Decision, the district court awarded attorneys' fees and costs to the Plaintiffs under 12 Okla. Stat. § 940(A), providing prevailing parties be awarded costs in "action[s] to recover damages for the negligent or willful injury to property."[10] Add.120, 125. Citing *Weyerhauser Co. v. Brantley*, 510 F.3d 1256, 1268 (10th Cir. 2007), the court recognized that Section 940(A) applies where a

---

[10] The court rejected Plaintiffs' request to recover fees under 23 Okla. Stat. § 64(3) for its experts and specialists, Add.117-18, and rejected that fees should be shifted in equity based on Enel's asserted litigation misconduct, Add.120-124.

prevailing party recovers damages for physical injury to property and identified

multiple allegations in the Amended Complaint of physical injury to the OME.

Add.118-19. Noting that Plaintiffs prevailed on those claims and were awarded

damages based on the value of minerals removed from the OME, the court held

those parties were "entitled to recover attorneys' fees and cost[s] related to their

successful trespass, conversion, and declaratory judgment claims." Add.126.

The court explained in its April 23, 2024 order on motions in limine that

Section 940(A) did not apply because Plaintiffs "have not *claimed* damages based

on physical injury to the [OME]," Add.118 (emphasis added) (citing 4-App.1104).

In that same order, the court held it would not exclude evidence about Enel's bad

faith as a basis for an equitable award of attorneys' fees and confirmed it would

"continue to defer consideration of the appropriateness and calculation of

attorneys' fees until after trial." 4-App.1104. Following trial, the parties briefed the

issue of attorneys' fees and costs. *See* 5-App.1229, 1241, 1253. Based on briefing

and trial evidence, the court concluded in its 2024 Decision that Plaintiffs had

claimed injury to the OME and were entitled to attorneys' fees and costs under

Section 940(A) for prevailing on their claims for conversion and violating federal

law by failing to obtain the necessary mining lease. Add.119-20.

The court also ruled Plaintiffs were authorized to recover attorneys' fees and

costs under the Declaratory Judgment Act, explained the statute is not an

independent basis to recover an award, but found that Section 940(A) provided a basis from Enel's "failure to obtain the necessary lease for [its] mining activities." Add.125 (citing Add.17-18). The court thoroughly analyzed the evidence in determining a reasonable award of fees and costs to reimburse Plaintiffs. Add.126-39.

Enel challenges Plaintiffs' entitlement to fees under Section 940(A) but not the amount of fees awarded. Opening Br.45-50. First, Enel argues Plaintiffs impermissibly raised Section 940(A) for the first time after entry of the March 15, 2024 Pre-Trial Order. Opening Br.46. Second, Enel argues that Section 940(A) does not allow for attorneys' fees and costs because the court relied in part on Plaintiffs' successful claim for conversion. Opening Br.46-50. Neither argument has merit.

This Court should reject Enel's procedural challenge that ignores how Plaintiffs raised Section 940(A) as a basis for attorneys' fees before trial and that the court deferred briefing until after trial. Enel suffered no prejudice from the omission of a reference to Section 940(A) in the Pre-Trial Order. Notably, the Pre-Trial Order contemplated the court may elect to not have attorneys' fees and costs proven at trial but would accept them by post-trial briefing. *See* 4-App.1067 (¶¶ g-h). And the court took that approach, electing to consider Section 940(A), a decision to be reviewed under an abuse of discretion standard. *See R.L. Clark*

*Drilling Contractors, Inc. v. Schramm, Inc.*, 835 F.2d 1306 (10th Cir. 1987) (relied on by Enel, Opening Br.46). Further, Enel failed to show a "manifest injustice" from the court's consideration of the argument.

This Court should also reject Enel's challenge to the applicability of Section 940(A) to this case, directing costs to the prevailing party "in any civil action to recover damages for the negligent or willful injury to property." 12 Okla. Stat. § 940(A). Plaintiffs brought declaratory relief, trespass, continuing trespass, conversion, and other claims against Enel for its negligent or willful damage to the OME, see Add.119, and prevailed on these claims and recovered damages. Enel does not dispute these facts.

Enel asserts attorneys' fees were erroneously awarded because Section 940(A) does not apply in conversion actions. Br. at 47-49 (citing cases). Even assuming this proposition is correct, it ignores Plaintiffs brought—and prevailed on—other claims *besides* conversion that sought recovery for physical damage to property. That is all that is required to fall within the scope of Section 940(A).

For example, in *Parks v. Am. Warrior, Inc.*, 44 F.3d 889 (10th Cir. 1995), this Court upheld an attorneys' fee award under Section 940(A) based on the underlying conduct at issue and the claims asserted in the pleadings. The Court determined fees were authorized even though the jury considered only breach of contract and fiduciary duty claims, and the damages were measured by the value of

reserves lost. *Id.* at 892. The *Parks* Court relied in part on *Marino v. Otis Eng'g Corp.*, 839 F.2d 1404, 1413 (10th Cir. 1988), noting that, "[w]e looked to the pleadings to find that Marino specifically claimed compensation for damage" to the property. *Id.* at 892-93. That is exactly what the court did here: it looked to the pleadings and found Plaintiffs had claimed compensation for physical damage to property—and prevailed on those claims.

Enel suggests *Weyerhauser* requires the court to award damages directly intended to compensate for physical injury to property in order to recover under Section 940(A) (Opening Br.48), but that overreads that case. In *Weyerhauser* (unlike here), plaintiffs' claims centered around possession and use of the property, not property damage. And as discussed above, the plain language of Section 940(A) looks to the pleadings, claims, and purpose of the action, not how the court in the end elected to measure damages awarded to the prevailing party. Further, Enel's hyper-technical interpretation of Section 940(A) and *Weyerhauser* is in significant tension with this Court's ruling in *Kimzey v. Flamingo Seismic Solutions, Inc.*, 696 F.3d 1045 (10th Cir. 2012). In *Kimzey*, the defendant prevailed, and relying on Oklahoma law, this Court rejected the argument that Section 940(A) does not apply because no damages for physical injury were awarded. Regardless of the measure of *damages* the court applied, so long as recovery relates to *a claim* for the willful or negligent, physical injury to property,

Plaintiffs are entitled to attorneys' fees under Section 940(A). *See* 5-App.1232-33

(collecting cases). If Section 940(A) applies equally to prevailing defendants and

prevailing plaintiffs, then its applicability must be assessed by the pleadings, not a

pedantic focus on the specific measure of damages.

Finally, Enel repeatedly emphasizes that Oklahoma law holds Section

940(A) applies to claims for *physical* injury to tangible property. Opening Br.47-

49. But as this Court explained in *Kimzey*, that distinction is meant only to exclude

"a non-physical injury similar to lost profits." 696 F.3d at 1050 n.5; *cf. Woods*

*Petroleum v. Delhi Gas Pipeline Corp.*, 700 P.2d 1011 (Okla. 1984) (rejecting

application of Section 940(A) to economic harms from miscalculation of gas);

*Turner Roofing & Sheet Metal, Inc. v. Stapleton*, 872 P.2d 926 (Okla. 1994)

(rejecting application of Section 940(A) to slander of title); *Stites v. Duit Constr.*

*Co.*, 992 P.2d 913 (Okla. Ct. App. 1999) (rejecting application of Section 940(A)

to slander of title); *Nat'l Livestock Credit Corp. v. Schultz*, 653 P.2d 1243, 1248

(Okla. Ct. App. 1982) (rejecting application of Section 940(A) to cattle security

agreement).

The term "injury to property" has been applied in a broad sense. *Sundance*

*Energy Okla., LLC v. Dan D. Drilling Corp.*, 836 F.3d 1271, 1281-1282 (10th Cir.

2016) (rejecting argument that damage must be to "producing formations or

reserves," rather, proper focus is "whether the property at issue sustained physical

injury"). The property at issue here is a mineral estate.[11] One can hardly imagine more damage to the OME than that caused by Enel. A mineral estate is nothing except volumes of in situ minerals. *See Cornelius v. Moody Bible Inst. of Chicago*, 18 P.3d 1081, 1084 (Okla. Civ. App. 2000) (unaccrued royalty of minerals is the mineral estates' "real property"). Here, Enel's willful trespass has resulted in an injury to the remaining OME by a magnitude of 315,346 tons. *See* Add.71-75.

To reverse the district court's application of Section 940(A), this Court would have to find Plaintiffs suffered only title damage or theoretical injury, never even *negligent* injury to the OME. *Stapleton*, 872 P.2d at 928. Such a conclusion would be inconsistent with Enel's admissions, the evidence, and the reasonable findings the court entered below. But Plaintiffs' claims here are not based on intangible or purely economic injuries—they are based on physical invasion and damage to the OME. The district court's award of attorneys' fees should be upheld.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

---

[11] Real property, including a mineral estate, is unique and cannot be re-generated once lost (or stolen). *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (collecting cases finding property interests "unique"). The unique and rich mineral deposits of Osage County motivated Congress to sever the OME from the surface, placing it in trust for the Osage Tribe with the government as trustee. *Fletcher v. United States*, 854 F.3d 1201, 1203 (10th Cir. 2017).

Respectfully submitted,

CLINTON J. JOHNSON
*United States Attorney*
*Northern District of Oklahoma*

*/s/     Nolan M. Fields IV*
NOLAN M. FIELDS IV
*Assistant United States Attorney*
110 West 7th St., Ste. 300
Tulsa, OK 74119
918.382.2700
Nolan.Fields@usdoj.gov

July 16, 2025

## STATEMENT REGARDING ORAL ARGUMENT

The United States agrees with the Appellants that oral argument would assist the Court.


## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limit of Fed. R. App. P. 32(g) because this brief contains 12,941 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(b).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/     Nolan M. Fields IV*
NOLAN M. FIELDS IV

**CERTIFICATE OF DIGITAL SUBMISSION**

I certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) the hard copies submitted to the clerk will be exact copies of the ECF submission; and

(3) the digital submission was scanned for viruses and, according to the program, is free of viruses.

*/s/     Nolan M. Fields IV*
NOLAN M. FIELDS IV


**CERTIFICATE OF SERVICE**

I hereby certify that, on July 16, 2025, I electronically filed the foregoing using the Court's CM/ECF system which will serve all case participants.

*/s/     Nolan M. Fields IV*
NOLAN M. FIELDS IV